ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| CDM Constructors Inc. | ) ASBCA Nos.    62026, 62088, 62089 |
| | ) |
| Under Contract No.    W912PL-12-C-0022 | ) |

APPEARANCES FOR THE APPELLANT:    Bret S. Wacker, Esq.
Emily J. Baldwin, Esq.
Jeffrey M. Gallant, Esq.
 Clark Hill PLC
 Detroit, MI

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
 Engineer Chief Trial Attorney
John F. Bazan, Esq.
Gilbert H. Chong, Esq.
Brian M. Choc, Esq.
 Engineer Trial Attorneys
 U.S. Army Engineer District, Los Angeles

OPINION BY ADMINISTRATIVE JUDGE SWEET

On December 3, 2020, appellant CDM Constructors, Inc. (CDM) moved for reconsideration (motion) of our decision on quantum in *CDM Constructors, Inc.*, ASBCA No. 62026 *et al.*, 20-1 BCA ¶ 37,721 (*CDM II*). In *CDM Constructors, Inc.*, ASBCA No. 60454 *et al.*, 18-1 BCA ¶ 37,190 at 181,013 (*CDM I*)—the entitlement decision—we held that, even though the Army Corps of Engineers had constructively changed the contract by imposing certain requirements related to evaporation ponds (EPs), the government did not constructively change the contract when it required CDM to include a standby EP. Moreover, as discussed in far greater detail in *CDM II* (with which we presume the reader is familiar), we held in *CDM II* that CDM had failed to prove quantum because it did not show that its revised 100 percent design—which CDM sought to use as a baseline with which to compare the contractual change—did not include a standby EP. Below, we find that the arguments CDM brings to this motion for reconsideration have been waived, and thus are not appropriate bases for reconsideration, because CDM did not raise those arguments in the initial quantum appeal. In any event, those arguments are meritless. Therefore, we deny the motion.

I. CDM Waived the Arguments that it Raises in its Motion, and Those Arguments are not Appropriate Bases for Reconsideration

CDM waived the arguments that it raises in its motion, and thus those arguments are not appropriate bases for reconsideration. Motions for reconsideration are only appropriate if they are based upon newly discovered evidence, mistakes in the findings of fact, or errors of law. *Green Valley Co.*, ASBCA No. 61275, 18-1 BCA ¶ 37,044 at 180,330. "Motions for reconsideration do not afford litigants the opportunity to take a 'second bite at the apple' or to advance arguments that properly should have been presented in an earlier proceeding." *Dixon v. Shinseki*, 741 F.3d 1367, 1378 (Fed. Cir. 2014) (citations and quotations omitted). As a result, in our discretion, we may find that arguments not raised in an opening post-hearing brief have been waived. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990).

Here, while CDM's motion for reconsideration is not entirely clear, we understand CDM's primary arguments[1] to be that: (1) the Board should not rely upon the water balance analysis because it merely provided an estimate (mot. at 9-15); (2) we should pro-rate CDM's costs (*id*. at 28-30); (3) the relevant design did not need the purported standby EP to prevent operational overflows (*id*. at 27-28); (4) the original operating scenario did not use the purported standby EP to prevent operational overflows, and merely diverted flow to the purported standby EP while cleaning an in-service EP (*id*. at 30-33); (5) under *res judicata* or the law of the case doctrine, *CDM I* precludes a finding that two months was a reasonable time to clean an EP (*id*. at 21-27); (6) the testimony of CDM's quantum EP expert (William B. O'Neil) established that the alternative operating scenario showed that the relevant design included a standby EP (*id*. at 18-21, 33-37); (7) CDM's request for equitable adjustment (REA) did not concede that the relevant design needed to use the purported standby EP to prevent operational overflows (*id*. at 37-39); and (8) our qualifying the Corps's quantum expert (Antonia Ortiz) as an expert caused unfair surprise and undue prejudice (*id*. at 15-18). Because CDM already had the opportunity to—and properly should have—advanced those arguments earlier, CDM merely seeks a second bite at the apple. Therefore, CDM waived those arguments, those arguments are not an appropriate bases for reconsideration, and we deny the motion.

---

[1] To the extent CDM raises other minor arguments, we find that it waived those arguments, and they are meritless.

## II. CDM's Arguments are Meritless

In the alternative, we deny the motion because CDM's arguments are meritless.

### A. Water Balance Analysis

#### 1. CDM's Argument that the Board Should not Reply Upon the Water Balance Analysis is Meritless

CDM's argument that the Board should not rely upon the water balance analysis because it merely provided an estimate is meritless (mot. at 9-15). As *CDM II* properly held, while the water balance analysis is only an estimate, that analysis is a relevant and reliable method for determining if a design includes a standby EP[2]—*i.e.*, if it is necessary to use a purported standby EP for net evaporation to balance inflows—because Ms. Ortiz, Mr. O'Neil, and CDM's entitlement EP expert (Dr. Beth Gross) all agreed that the determination of whether net evaporation balances inflows should start with a water balance analysis (finding ¶ 6). Indeed, CDM's continued attempts to minimize the usefulness of the water balance analysis in determining if net evaporation balances inflows is not persuasive in light of the fact that its entitlement EP expert relied upon a water balance analysis for that precise purpose (findings ¶¶ 6-8).

#### 2. CDM's Argument that the Board Should Pro-Rate Costs is Meritless

CDM argues, in the alternative, that we should pro-rate its costs by 1.3 percent to reflect the 1.3 percent increase in the required surface area and depth that *CDM II* purportedly found the water balance analysis showed was needed in the relevant design for net evaporation to balance inflows (mot. at 28-30). That argument assumes that the deficiency that *CDM II* found in the relevant design was that it lacked 1.3 percent standby capacity. However, as we held in *CDM I*, the 0022 Contract did not require standby capacity, but a standby EP. Thus, the problem with the fact that the required surface area exceeded the available surface area at the maximum depth by 1.3 percent was not that that fact showed a 1.3 percent lack of standby capacity. Rather, the problem with that fact was that it showed that the purported standby EP was not a standby EP because the relevant design—which CDM made the litigation decision to rely upon exclusively as its baseline on the assumption that it had a standby EP—needed to use the purported standby EP to prevent operational overflows. As a result, we cannot simply pro-rate costs to reflect a purported lack of standby capacity.

---

[2] We continue to use terms as defined in *CDM II*. Further, all citations to "finding" are to the findings of fact in *CDM II*.

In any event, it cannot be inferred from *CDM II*'s finding that the required surface area was 1.3 percent greater than the available surface area at the maximum depth that the required surface area and depth only would need to have been 1.3 percent larger in order for net evaporation to balance inflows. That inference assumes that the water balance analysis would show that net evaporation would balance inflows if the required surface area equaled the available surface area at the maximum depth. However, under *CDM II*, the required surface area should have been significantly less than the available surface at the maximum depth because the required surface area is the average surface area needed for net evaporation to balance inflows, but the EPs cannot continuously be operated at the maximum depth to provide that average required surface area (finding ¶ 8). As a result, we cannot simply pro-rate CDM's costs by 1.3 percent to reflect the required surface area at the maximum depth.

      B.   <u>CDM's Model does not Support Finding that the Relevant Design Included a Standby EP</u>

          1.   <u>CDMS's Argument that the Relevant Design did not Need the Purported Standby EP to Prevent Operational Overflows is Meritless</u>

CDM's argument that the relevant design did not need the purported standby EP to prevent operational overflows is meritless (mot. at 27-28). CDM's assertion that it input inflow data into its model to determine the required water depth once operating decisions were made is beside the point (mot. at 27-28). That assertion does not change the fact that CDM failed in its attempt to use its model to establish that the relevant design included a standby EP because it did not present any operating scenario under which its model showed that the required water depth was less than the available water depth without using the purported standby EP. On the contrary, the Corps had to use the purported standby EP for more than the two months that it took to clean the in-service EPs under both operating scenarios presented by CDM. Because the two operating scenarios presented by CDM showed that the relevant design needed the purported standby EP to prevent operational overflows, CDM failed to meet its burden of showing that the relevant design included a standby EP. (Findings ¶¶ 9-11; *CDM II*, 20-1 BCA ¶ 37,721 at 183,108-09).

          2.   <u>CDM's Argument that the Original Operating Scenario did not use the Purported Standby EP to Prevent Operational Overflows, and Merely Divert Flow to the Purported Standby EP While Cleaning an In-Service EP is Meritless</u>

CDM's argument that the original operating scenario did not use the purported standby EP to prevent operational overflows, and merely diverted flow to the purported standby EP while cleaning an in-service EP is meritless (mot. at 30-33). While CDM is correct that the original operating scenario did not show an operational

overflow, it achieved that result by diverting flow to the purported standby EP every 12 months (finding ¶ 9).  However, the only credible evidence about whether that 12 months was a reasonable length of time to clean the in-service EPs established that that was an unreasonable amount of time because it reasonably only took 2 months to clean an in-service EP (finding ¶ 3).  Therefore, as Ms. Ortiz testified, the original operating scenario went beyond merely diverting flow to the purported standby EP while cleaning the in-service EPs, and instead used the purported standby EP to prevent operational overflows (finding ¶ 9).

### 3. CDM's Argument that, under the *Res Judicata* or the Law of the Case Doctrines, *CDM-I* Precludes our Finding that two Months was a Reasonable Time to Clean an EP is Meritless

CDM's argument that, under the *res judicata* or the law of the case doctrines, our decision on entitlement in *CDM I* precludes our finding that two months was a reasonable time to clean an EP is meritless (mot. at 21-27).  Under *res judicata* or the law of the case doctrines, "[i]ssues decided in an entitlement proceeding cannot be relitigated in a subsequent quantum appeal."  *W.C. Fore Trucking, Inc.*, ASBCA No. 40663, 93-2 BCA ¶ 25,703 at 127,864.  In *CDM I*, we merely held that a standby EP is an EP that is operational, but not in use unless or until there is an emergency. *CDM I*, 18-1 BCA ¶ 37,190 at 181,008 n.12.  *CDM I* did not address the issue of whether diverting flow to a purported standby EP while cleaning an in-service EP constituted "use;" let alone for how long such a diversion for cleaning could qualify as non-use based upon the reasonable length of time it took to clean an in-service EP.  *Id*.

Indeed, in its reply brief, CDM concedes that its complaint is that *CDM I* "did not find that the Contract included a limitation on the time a Standby EP could be put in service" (app. reply br. at 7).  *Res judicata*, of course, is inapplicable when a "prior decision[] did not consider or decide [an] issue[]"  *Soledad Enterprises, Inc.*, ASBCA No. 25826, 82-1 BCA ¶ 15,517; *see also Steven E. Jawitz*, ASBCA No. 33610, 87-3 BCA ¶ 20,011.  Thus, because *CDM I* did not consider or decide the issue of what was a reasonable length of time to divert flow to a standby EP while cleaning an in-service EP, *CDM I* does not preclude *CDM II*'s finding that two months was a reasonable length of time for such a diversion (finding ¶ 3).

### 4. CDM's Argument that Mr. O'Neil's Testimony Established that the Alternative Operating Scenario Showed that the Relevant Design Included a Standby EP is Meritless

CDM's argument that Mr. O'Neil's testimony established that the alternative operating scenario showed that the relevant design included a standby EP is meritless (mot. at 18-21, 33-37).  *CDM II* properly gave little weight to Mr. O'Neil's testimony that the alternative operating scenario showed that the relevant design included a standby

EP for three reasons.  First, *CDM II* properly gave little weight to Mr. O'Neil's alternative operating scenario testimony because there was an unexplained, large discrepancy between the average required depth[3] of over 60 inches under Mr. O'Neil's water balance analysis, and the average required depth of 20 inches[4] under his alternative operating scenario (finding ¶ 11).  CDM argues that Mr. O'Neil's water balance analysis did not show that the average required depth was over 60 inches because 60 inches was the maximum depth, and not the average required depth (mot. at 34).  That argument ignores the fact that the average required surface area in Mr. O'Neil's water balance analysis was greater than the surface area at the maximum depth, so the average required surface area occurred at a depth greater than the 60 inch maximum depth.[5]  Thus, the required depth in Mr. O'Neil's water balance analysis had to be greater than the 60 inch maximum depth (findings ¶ 7 n.4, ¶ 11 n.6).

Second, *CDM II* properly gave little weight to Mr. O'Neil's alternative operating scenario testimony because CDM only supported that testimony with a demonstrative exhibit, instead of with evidence (finding ¶ 11).  While CDM is correct that Mr. O'Neil offered to make tables of data available to the Corps during his cross-examination, CDM mischaracterizes what occurred at the hearing when it states that the Corps rejected that offer (mot. at 19 (citing tr. 3/45)).  Instead, the Corps correctly argued that it already had suffered prejudice from not having the tables before it cross-examined Mr. O'Neil (tr. 3/45).  In any event, independent of any obligation to disclose information to the government, it was CDM's burden to prove quantum to the Board.  *B.R. Servs., Inc.*, ASBCA No. 47673 *et al.*, 99-2 BCA ¶ 30,397 at 150,272.  The absence of any of the data regarding CDM's model using the alternative operating scenario prevented us from verifying the veracity of Mr. O'Neil's alternative operating scenario testimony, and thus undermines the weight to which that opinion is entitled.

Third, *CDM II* properly gave little weight to Mr. O'Neil's alternative operating scenario testimony because the supporting demonstrative exhibit showed that the purported standby EP needed to be used for more than the two months a year while

---

[3] CDM quibbles over the term "required depth," incorrectly suggesting that *CDM II* found that the 0022 Contract required a particular depth (mot. at 32-34; app. reply br. at 9).  However, *CDM II* clearly defined the term "required depth" as the depth an analysis or model concluded a design's EPs—and not the 0022 Contract—required for net evaporation to balance inflows (finding ¶ 9).

[4] CDM mischaracterizes *CDM II* as holding that the "'required depth' of the EPs [under the alternative operating scenario] was 40 inches" (mot. at 33).  In fact, *CDM II* held that, while "the required depth *did not exceed* about 40 inches" (finding ¶ 10 (emphasis added)), it averaged 20 inches (finding ¶ 11).

[5] The relevant design EPs contained set dimensions, so they would have a particular surface area at a particular depth (R4, tab 1057 at 2,947).

cleaning the in-service EPs (finding ¶ 11).  In support of its motion, CDM submits a new exhibit that adds annotations to the graph in the demonstrative exhibit.  Those annotations assert that the two months the purported standby EP was in service each year were June and July.  (Mot., ex. B)  However, even if CDM had not waived the annotations by failing to include them in the demonstrative earlier (which is not the case), there is no evidence or testimony—let alone expert testimony—supporting those annotations (mot. at 36-37).  Indeed, we cannot even verify the annotations against the demonstrative graph because that graph only shows years, and not months.  Without an indication of months, we are left to estimate from the graph how many months a year the purported standby EP was in service (trial ex. 5).  As best as we can determine under those limitations created by CDM, the purported standby EP was in service for more than two months a year under the alternative operating scenario (finding ¶ 11).

### 5. CDM's Argument that its Request for an Equitable Adjustment did not Concede that the Relevant Design Needed to use the Purported Standby EP to Prevent Operational Overflow is Meritless

CDM's argument that its REA did not concede that the relevant design needed to use the purported standby EP to prevent operational overflows (mot. at 37-39) is meritless because the REA failed to use the infinity symbol ($\infty$) for the relevant design EP standby period, and CDM acknowledged that an infinity symbol represented a standby EP that was not used to prevent operational overflows (finding ¶ 15).  CDM does not dispute that the REA failed to use the infinity symbol for the relevant design EP standby period.  Rather, it argues that it did not acknowledge that an infinity symbol represented a standby EP that was not necessary to prevent operational overflows (mot. at 37-39).  However, in the REA, CDM stated that "the Corps directed that the 'standby' pond could not be used for any operational overflow, and that its standby period is considered to be 'infinity'" (R4, tab 4 at 36).  While CDM's REA disputed the government's position that a standby EP could not be used to prevent operational overflows, it did not dispute that an infinite standby period referred to an EP that was not used to prevent operational overflows (id.).  On the contrary, the fact that CDM proceeds to use the infinity symbol in REA attachment C's standby period column without proffering any alternative definition of the term infinity, leaves the only definition of infinity that CDM reasonably could have meant as the one referred to earlier in the REA—namely an EP that was not used to prevent operational overflows (id. at 36, 109).  Indeed, the fact that CDM used the infinity symbol in attachment C to represent the standby period "Per GOV Direction" demonstrates that CDM acknowledged that the infinity symbol—as used in attachment C—had the "Corps-directed" meaning of an EP that was not used to prevent operational overflows (id.).

In any event, CDM ignores the more important point that, by indicating in attachment C that the relevant design only had a standby period of 12 months while the government direction was to provide an infinite standby period, CDM

acknowledged that the relevant design did not meet the government direction that the standby EP could not be used to prevent operational overflows (*id*. at 109). That acknowledgement, in turn, effectively means that the REA conceded that the relevant design did not satisfy *CDM I*'s definition of a standby EP because *CDM I* adopted the government directed definition of a standby EP as an EP that was not necessary to prevent operational overflows. *CDM I*, 18-1 BCA ¶ 37,190 at 181,012-13.

### C. CDM's Argument that our Qualifying Ms. Ortiz as an Expert Caused Unfair Surprise and Undue Prejudice is Meritless

CDM again mischaracterizes what occurred at the hearing when it argues that our qualifying Ms. Ortiz as an expert after we purportedly rejected her as an expert and CDM presented its case-in-chief caused unfair surprise or undue prejudice (mot. at 15-18). While CDM is correct that we ruled at the beginning of the hearing that Ms. Ortiz did not qualify as an expert in EPs (tr. 1/9-13), it neglects to mention that we also ruled prior to CDM's case-in-chief that the Corps could *voir dire* Ms. Ortiz after CDM's case-in-chief to establish that Ms. Ortiz qualified as an expert in the sizing of ponds for outflows to balance inflows more generally (tr. 1/17-18).[6] Therefore, our qualifying Ms. Ortiz as an expert in pond sizing after the *voir dire* that we had informed the parties we would allow the Corps to conduct after CDM's case-in-chief did not cause unfair surprise. Moreover, CDM did not suffer undue prejudice because CDM had ample opportunity to cross-examine Ms. Ortiz, and to respond to her testimony during rebuttal (tr. 2/208-64, 3/12-43).

Also meritless is CDM's argument that it was prejudiced by the fact that Ms. Ortiz's expert reports did not indicate that two months was a reasonable time to divert flow to a standby EP while cleaning an in-service EP (mot. at 16-17). While Ms. Ortiz's expert reports did not specifically refer to two months (tr. 3/28), her rebuttal report clearly opined that the relevant design went beyond diverting flow to the purported standby EP while cleaning an in-service EP, and instead used the purported standby EP to prevent operational overflow (R4, tab 1000 at 3-4). If CDM was unclear about the specific reasons why Ms. Ortiz thought that the relevant design went beyond diverting flow to the purported standby EP while cleaning an in-service EP—*i.e.*, because the relevant design used the purported standby EP for more than the two months that it reasonably took to clean an in-service EP—it could have questioned Ms. Ortiz about that issue at her deposition. In any event, CDM suffered no prejudice because it had the opportunity to cross-examine Ms. Ortiz and present rebuttal evidence regarding Ms. Ortiz's opinion that two months was a reasonable time to divert flow to a standby EP while cleaning an in-service EP. Yet it failed to impeach

---

[6] CDM did not preserve its argument that qualifying Ms. Ortiz as an expert caused unfair surprise or undue prejudice by raising that objection at *voir dire* (tr. 1/18-20).

Ms. Ortiz's testimony or to present any contrary evidence on that issue. (Tr. 2/208-64, 3/12-43)

CONCLUSION

For the reasons discussed above, CDM's motion for reconsideration is denied.

Dated: April 7, 2021

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62026, 62088, 62089 Appeals of CDM Constructors Inc., rendered in conformance with the Board's Charter.

Dated: April 8, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals